[Civ. No. 14428.  First Dist., Div. One.  Jan. 22, 1951.]

ETHEL W. GIANNINI, Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, as Executor, etc., et al., Respondents.

Walter E. Hempstead, Jr., for Appellant.

Phillip Barnett, Wesley M. Kergen and Robert L. Dreyfus for Respondents.

WOOD (Fred B.), J.—Plaintiff appeals from a judgment rendered for defendant, the executor of the will of Joseph D. Osborne, in an action to quiet title to certain shares of corporation stock.

Appellant claims that these shares, evidenced by certificates of stock issued to and in the name of Osborne, were given to her by Osborne in his lifetime; that her testimony shows, without contradiction, that he did give them to her; that such testimony must be accepted as adequate proof of her claim; and, therefore, that the judgment is against the evidence and must be reversed.

It is not the law that a trial court must accept as true and accurate in every particular the testimony of a witness who is unimpeached. "In passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider their interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence." (*Huth* v. *Katz*, 30 Cal.2d 605, 609 [184 P.2d 521].) It is necessary, therefore, to examine the record and ascertain what the trial judge had before him when he decided that appellant had not met the burden of proving the consummation of the asserted gift of these shares of stock.

It appears that Osborne operated a small grocery store at 13th Avenue and Clement Street in San Francisco. Appellant lived on Judah Street near 38th Avenue. She first entered the store in June, 1942, on her way home from a club meeting. Thereafter, and until September, 1943, she shopped at Osborne's store two or three times a month, especially for canned goods, and because his prices were satisfactory. She first met Osborne formally at the home of one Pulos about a year after first going to the store. Until that meeting she did not know Osborne's name, and believed he did not know her name. After that meeting, on several occasions appellant drove Osborne to the bank and to a doctor's office. He never visited in her home nor she in his.

During the summer of 1943, Pulos and appellant's husband, Nick Giannini, met with Osborne several times and discussed the financing by Osborne of a business Pulos and Nick were interested in opening on the desert at Amboy, San Bernardino County. Osborne advanced money for the venture. Pulos and Nick moved to Amboy in October, 1943. Osborne followed a few months later and stayed with them

at Amboy until his death in June, 1946. Appellant continued to live at San Francisco.

In November, 1945, according to appellant, she received a telephone call from Nick who connected her with Osborne; Osborne informed her he had been sick, was going to make a will and would make her the beneficiary. Then, in February, 1946, she received another call from Nick, who called Osborne to the telephone, and Osborne told her he had been very sick and was mailing her a package; that he wanted her to keep it; that it was hers. Nick testified that he placed each call at Osborne's request but did not listen in or hear any of the conversation between Osborne and appellant.

Next, according to appellant's testimony, on March 15, 1946, she received in her mailbox a package addressed to her and bearing the return address "Joseph Osborne, Amboy, California." She did not look at the postmark but she did notice cancelled stamps on the package. She did not keep the wrapping. Enclosed in the package, within an envelope, on which was written "To Ethel Giannini," were the stock certificates which are the subject of the action. She did not recognize the handwriting on the envelope. It was not Osborne's nor hers, nor Nick's. Her receipt of this package was corroborated by one Rose Thomas, a friend who accompanied her upon her return to her home on the evening of March 15 and who was with her when she opened the mailbox.

Appellant testified that on the following day, March 16, 1946, she telephoned Nick and had him call Osborne to the telephone; told Osborne she had received the package but that the stocks were not signed; that he replied she need not worry about it, that the first time he came to San Francisco he would take her to the bank and would take care of it for her; also, that he was awful sick, did not think he would be here very much longer and he wanted her to get those stocks because they were negotiable and if he should die before he got to San Francisco she was to take them to the Bank of America and she could trust the bank. (The stock consisted, principally, of shares issued by Bank of America and by Transamerica Corporation.) She never heard from Osborne again after that conversation.

As the trial progressed, some rather significant conflicts developed in the testimony of the witnesses. Nick came on after appellant and Rose Thomas had testified. He said, upon

cross-examination, that he was in San Francisco in the neighborhood of a week before or after March 15, 1946, because of his son; did not know where the son was; appellant was sick over the son's absence, and Nick had to come home. Upon redirect, he said it could have been in May instead of March, 1946, and that he had not been in San Francisco previous to that time.

Appellant was then recalled to the stand and testified that after Nick went down to the desert in 1943 he came up to San Francisco to see her in December, 1944, and again in May, 1946, the latter occasion being when their son ran away; also, that Nick was not in San Francisco all during 1945 and 1946 except that occasion in May, 1946.

Pulos, a witness on behalf of the respondent, testified that Nick made two trips to San Francisco in 1946; one in March and one in May. He did not know the reason for Nick's coming in March. The visit in May was because Nick's boy had disappeared. The witness had a way of checking the dates because when Nick went away he usually asked Pulos for $200 or $300, and he drew $200 or $300 in March; if Pulos had his records with him, he could tell when in March it was.

Nick was recalled by appellant, in rebuttal, and testified it was in May, 1946, that his son went away and he, Nick, came to San Francisco; also, that he was in San Francisco in March of the same year, around the middle of March; could not say if it was the forepart or the latter part of March; he thought he was there around 8 or 10 or 12 days; he visited his wife, stayed at home, on that occasion, except when he went down to San Jose to see his brother, who was sick; could not say if he was in San Francisco on March 15; also, that he was again in San Francisco in October.

It further developed from Pulos' testimony that this stock while in Osborne's possession was accessible to Nick and that some time after Nick's visit to San Francisco in March, 1946, Osborne told Pulos he had lost his stocks and did not know where they had gone to, and seemed upset about it, but said he would probably find out where they had gone and that Pulos need not worry about it "because even if they are lost, we have the duplicates at the bank." Osborne never told Pulos that he had given them to anybody.

According to Pulos, Osborne kept his personal effects in boxes. Included was a can of money, also a Chesterfield

carton in which he kept his stocks and other papers. At first, during his stay at Amboy, Osborne slept in the living room of the living quarters next to the store, and kept these boxes of his in an adjoining bedroom occupied by Mr. and Mrs. Pulos. About two and one-half months before Osborne died, he moved his belongings to a cabin occupied by Nick and then kept them there; took them over himself, some two or three boxes, including the carton that contained the stock. Osborne had access to that cabin, for he had a key to it and went there quite frequently, which would be when he would shave, two or three times a week.

Pulos knew about these belongings of Osborne's, including the stock, and how and where they were kept, because Osborne had shown them to him on a number of occasions; also, that that stock was similar in appearance to and was folded in the same manner as the certificates in evidence in this action.

Nick had previously testified, upon cross-examination, that Osborne had personal belongings in Nick's cabin, some boxes, which were in the cabin for two or three months, but that he never had occasion to see what was in them; never saw any money in the box, nor any stock certificates; also, that subsequent to the time Nick was in San Francisco, on or about March 15, 1946, Osborne told Nick he was missing some personal property, said he had some stocks and they were missing. When recalled, in rebuttal, Nick said he never saw these stocks until yesterday; never saw them in Amboy; Mrs. Pulos told him Osborne had them there; Nick did not know where they were; always thought Mrs. Pulos had them in the safe, keeping them for Osborne; assumed that they were there; also, when Osborne told about the stock being missing Osborne did not seem to be upset; he came into the cabin and said, "My stocks are gone," and Nick said, "No! Joe, you better report to the bank," and then Osborne smiled and went out and Nick thought he was just fooling, because he never mentioned after that any more about the stock.

An additional circumstance was Osborne's long acquaintance with Pulos and his relatively short acquaintance with the Gianninis. Pulos testified that he had known Osborne some 22 years, and that Osborne discussed all his personal affairs with him; that Pulos discovered this deal down in the desert, interested Osborne in it and worked out the details of it with Osborne before Nick ever heard about it; that after Osborne decided he would help Pulos buy the place Pulos told him

he would like to have Nick as a partner but Osborne objected to Pulos having any partners, saying that if Pulos wanted to go alone he, Osborne, would help Pulos and give him all the money he needed; that Pulos then gave Osborne his word he would never go into partnership with anyone; and, accordingly, Pulos took Nick as an associate in the enterprise, not as a partner. Nick had previously testified that he and Pulos were partners, but when later recalled in rebuttal did not testify on this subject.

Another circumstance is the fact, according to Pulos, that Osborne disapproved of Mrs. Giannini's not moving down to the desert when her husband had to be there all the time; also, that Osborne "has always told us [Mr. and Mrs. Pulos] what he possessed was ours, and if I brought him down to the desert, and he lived [there] the rest of his life, everything he possessed would go to us."

Thus, it appears that appellant's testimony is not in all respects uncontradicted by the testimony of other witnesses. Her testimony that all during 1945 and 1946 her husband was in San Francisco but once (in May of 1946) and the testimony of Pulos and Nick that he visited San Francisco both in March and May, and of Nick that he stayed with appellant while there in March, produced a conflict which the trial judge well may have deemed significant in view of her testimony that she found the stock certificates in her mailbox on the 15th of March, 1946. Then, the fact that Osborne did not endorse the certificates over to appellant; that he told both Nick and Pulos that he had lost his stocks and did not know where they had gone, and never told Pulos he had given them to anybody, tended to cast doubt upon appellant's claim that Osborne delivered the certificates to her with the specific intent of giving them to her, of vesting title in her. These factors, coupled with the relatively brief period during which Osborne had known the Gianninis and his relatively slight acquaintance with them, contrasted with his long acquaintance with and closer personal relationship to Mr. and Mrs. Pulos, were circumstances, among others, which amply support the implied finding of the trial court that appellant failed to prove that Osborne consummated a gift to her of these stocks during his lifetime.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.